UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROY ALLEN ROBINSON,

               Petitioner-Defendant,                  Case No. 03-80686
                                                  Honorable Julian Abele Cook, Jr.

v.

UNITED STATES OF AMERICA,

               Respondent-Plaintiff.

ORDER

       On January 10, 2005, the Court entered a judgment which reflected the finding by a jury that

the Petitioner, Roy Allen Robinson, was guilty of being a "felon in possession of ammunition" in

violation of 18 U.S.C. § 922(g)(1). The Court sentenced him to serve seventy seven months of

imprisonment in the custody of the Bureau of Prisons to be followed by two years of supervised

release. Thereafter, Robinson filed an appeal with the Court of Appeals for the Sixth Circuit which

affirmed the challenged judgment on July 23, 2007.

I.

       On October 15, 2008, Robinson, acting with the assistance of counsel, filed a Petition for

Habeas Corpus Relief pursuant to 28 U.S.C. § 2255 in an effort to vacate or set aside his conviction

and sentence on the basis of an ineffective assistance of counsel claim. Eleven days later (October

26, 2008), he submitted a formal request to conduct discovery, relying upon Rule 6 of the Rules

Governing § 2255 Cases.[1] On January 22, 2009, and before authorizing any discovery, the Court

---

[1] This motion for discovery was withdrawn by Robinson during a subsequent evidentiary
hearing (i.e., on January 28, 2010).

1

issued an order which required his trial attorney, Marvin Barnett, to state, in writing, to what extent, if any, he concurred with Robinson's representations. Barnett responded to the directive from the Court by filing the required submission on February 3rd, in which he expressed his disagreement with Robinson's claims.

Robinson and the Government subsequently presented the Court with a stipulation which, if found to be acceptable to the Court, would resentence him to no more than fifty seven months in the custody of the Bureau of Prisons. However, the Court, believing that this stipulation would implicitly give credence to Robinson's accusations without giving Barnett an opportunity to be heard, rejected this proposal and thereafter referred the issue to a magistrate judge for his consideration.

On August 20, 2009, the magistrate judge submitted a report, in which he recommended to the Court that it accept the proposed stipulation if (1) the Government agreed that Robinson's motion to vacate should be granted, (2) the parties entered into a new Rule 11 plea agreement, and (3) Robinson proffered a plea of guilty pursuant to the new Rule 11 plea agreement. On November 19th, the Court convened a status conference in order to advise the parties of the reasons why it found the proposed stipulation to be unacceptable. At that time, the Court stated that, inasmuch as the currently pending motion to vacate is premised on a belief that Barnett had provided him with constitutionally ineffective assistance of counsel, its acceptance of the parties' proposed stipulation would constitute an implicit acceptance of Robinson's claims as well as an implicit rejection of his attorney's position on the issue. The Court also advised the parties that without any other basis upon which to warrant Robinson's re-sentencing, it would not disturb his sentence.

On January 6, 2010, the Court convened an evidentiary hearing regarding Robinson's motion

to vacate. During this hearing, Barnett advised the Court that his ability to respond to the Government's questions was hampered because Robinson had not waived his attorney-client privilege. Thereafter, the Court elicited the allegedly privileged testimony from Barnett during an *in camera* session, followed by a directive to the parties to submit briefs that would address the question of whether Robinson, in filing a § 2255 petition, had impliedly waived his attorney-client privilege. The evidentiary hearing was continued until January 28th, when the Court ruled that (1) in filing his petition on the basis of an ineffective assistance of counsel claim, Robinson had implicitly waived the attorney-client privilege, and (2) Barnett's *in camera* testimony could be disclosed to the parties who would thereafter be permitted to examine him regarding any of the issues that were pertinent to this hearing.

The Court also addressed a motion by the Government to strike certain affidavits that had been proffered by Robinson and conditionally admitted into the record. It was the ultimate conclusion of the Court that it would not accept these affidavits for substantive purposes if it had been shown that the affiants were within its subpoena power. Thereafter, Robinson produced one of the affiants as a witness during the January 28th hearing.

The Court then authorized Robinson and the Government to submit post-hearing briefs regarding the pending issues. The Court now turns to the merits of Robinson's petition.

II.

On the first day of the trial in this criminal case and prior to the entry of the jury into the courtroom, the parties proffered a stipulation which, in essence, stated that (1) Robinson had been convicted of two felonies and (2) the Government would be able to prove these two convictions beyond a reasonable doubt at trial. Barnett then advised the Court that (1) Robinson would testify

during the trial and (2) it was his belief that any information relating to his client's prior convictions was irrelevant because of the parties' stipulation. The Court, in responding to Barnett's motion, made a preliminary ruling that the production of this evidence would not be relevant to the issues in this case.

At the conclusion of the Government's opening statement during the trial, Barnett made the following comments during his opening statement when he asserted, in part, the following to the jury:

> Mr. Robinson, we expect that he will testify in this case. I'm going to discuss his testimony, I anticipate, briefly. And the moment he gets up on that witness stand the prosecutor is going to try to put him in a bad light. The moment he gets up there they are going to try to start giving dispersions, trying to mak[e] you look at this man inappropriately. That's their attack. Mr. Robinson is not afraid. He has taken the witness stand and we don't care what attempts the government makes to destroy his credibility. He's going to get on the witness stand and he is going to testify truthfully and he's going to indicate to you that he lives in that area, that that is his house at 6377, that there was no auto stripping, that there were people out in the street but nobody was gambling.
>
> He's going to testify that the police came down the street and jumped out and started harassing the people in the street for no reason. Mr. Robinson is going to testify that he was not in any group. He was on the side. And then he made a huge mistake. A huge mistake. Those people are being slammed on his 300M in front of his house. The police are throwing people on his vehicle. And he walks up to the police to tell them about that. What in the world did he do that for? Must have lost his mind to start challenging the Detroit Police Department. Why are you doing it? Could you move it? What is going on? Okay, big fella. He's going to testify. Come on. Come on here. Mr. Robinson is not in the street. And he's going to testify that they approached Mr. Robinson and that they now want to search him. And they start grabbing on him. And Mr. Robinson is going to say, oh, no, what are you doing? And he starts walking back away from them.

(Jury Trial, 45:10-46:17, June 30, 2004.)

At the conclusion of Barnett's opening statement, the Government produced the two arresting Detroit Police officers (Walter Harris and Glen Johnson), both of whom testified that on

the fourth of July 2003 at approximately 12:15 in the morning, they were dispatched to investigate a possible auto stripping on Mt. Elliott and Selkirk streets in Detroit.

Johnson testified that he and his partner arrived at the scene and observed a gathering of approximately five or six persons gambling on the street. As the officers approached the men in their patrol car, one unidentified man ran into a nearby house. The remaining individuals were ordered by the officers to place their hands against a vehicle.

Harris testified that he then observed Robinson, one of the individuals standing against the vehicle, move his hands in an apparent attempt to reach into his right-hand pocket. Thereafter, Harris, after directing Robinson to return his hands to the vehicle, stood behind him in an effort to regain control over the situation. But, according to Harris, Robinson - without authority - suddenly left the immediate area and ran toward an otherwise empty debris littered field. A chase followed. Harris, while running after Robinson, observed him to be tugging at his right-hand pocket. At this point, Harris says that he pulled out his weapon and pointed it at Robinson who removed a pager and a gun from his pocket, both of which were thrown to the ground. A physical struggle on the ground followed. Harris asserts that he made an effort to put handcuffs on Robinson who continued to resist and remain non-compliant until Johnson came to his aid with a shot gun.

Johnson noted that by the time of his arrival to give some assistance to his partner, Robinson had already been handcuffed by Harris. Johnson also asserts that Harris retrieved the weapon that had allegedly been thrown to the ground by Robinson. The officers then took Robinson to their car and then to the police station.

Following the completion of the Government's case in chief, Barnett called only one witness, Agent Steve Hassler from the Alcohol, Tobacco, Firearms and Explosives agency. During a side

bar conference which followed, Barnett advised the Court and the Government that he intended to call Robinson and "ask him no questions at all and rest [his] case." (Jury trial, 205:7 July 1, 2004.) Barnett called Robinson to the stand, asked him to identify himself, and thereby completed the examination of his client.

During the evidentiary hearing to support his § 2255 petition, Robinson presented a much different version of events relating to his arrest. According to Robinson, he was sitting on the porch of his home during the early morning hours of July 4, 2003 and observed the officers direct family and friends and order them to stand by a car that had been parked in front of his house. Robinson (denying that he possessed any articles in his pockets except for a pocket knife and a pager) approached the officers and asked "what is the problem?" (Evid. Hrg., 26:10-14, Jan. 6, 2010.) Ignoring Harris' directive to stay back, Robinson proceeded to walk toward him and, again, made inquiries as to the reasons for the placement of his family members against his car. It was at this point in his encounter with Harris that he was given a physical pat down by the officer who "proceeded to try to undercut [him] with his other hand and leg and throw [him] down on [his] face or ground or something of that nature." (*Id.* at 28:8-11.) Robinson asserted that, once he was on the ground, a second officer (Johnson) came over to them, "racked"[2] a shotgun, and pointed it at his head. According to Robinson, Johnson "began butting [him] with it and kicked [him] in the side of the head and put his feet on the back of [his] neck and [the officers] proceeded to handcuff [him]." (*Id.* at 28:17-22.) Robinson was then placed inside of the patrol car where he remained until his arrival at the police station. Robinson maintains that after having been placed in the police vehicle,

---

[2]The word, "racked" is used when the possessor of a shotgun, puts a bullet in the chamber of the weapon which, when inserted, makes a distinctive noise.

he saw Harris walk to a nearby vacant lot and undertake a ground search. Robinson testified that he never went into the vacant lot at any time while the police officers were present.

Robinson also indicated that his family and friends were present during his altercation with the officers, and some of them are believed to have registered citizen's complaints with the Detroit Police Department regarding the maltreatment by the officers. According to Robinson, he advised Barnett that all of these witnesses were willing to testify at his trial, but none of them were contacted or interviewed by his counsel. One such person, Willard Ware, testified at the January 28, 2010 evidentiary hearing and substantially corroborated Robinson's version of the events in question.

## III.

Robinson has filed a motion to vacate or set aside his conviction and sentence pursuant to 28 U.S.C. § 2255, which provides, in part:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.
> . . .
> If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

28 U.S.C. § 2255 (a), (b).

The Sixth Amendment of the United States Constitution provides the following:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be

informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

U.S. Const. Amend. VI.

As stated by the Sixth Circuit Court of Appeals (Sixth Circuit) in 2009, the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984) established a two part test for an aggrieved petitioner to prove that he was the recipient of ineffective assistance of counsel. *Holder v. Palmer*, 2009 U.S. App. LEXIS 26764 at *17-18 (Dec. 9, 2009). The Sixth Circuit declared as follows:

First, the petitioner must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court considering a claim of ineffective assistance of counsel must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Second, the petitioner must show that counsel's performance prejudiced the petitioner. That is, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

*Id.* (internal citations omitted). Moreover, a reasonable probability is less demanding than the "more likely than not" standard and is only "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 693-94.

A.

Robinson first claims that his trial counsel, Marvin Barnett, was objectively unreasonable when he promised the jury that his client would present his version of events and, thereafter, only allowed him to state his name. In his opinion, this conduct severely prejudiced the outcome of his trial.

Several circuit courts have recognized the legitimacy of an ineffective assistance of counsel

claim that is based, in part, on an unfulfilled promise to the jury. In 1993, the Third Circuit Court of Appeals (Third Circuit) opined in *McAleese v. Mazurkiewicz*, that "[t]he failure of counsel to produce evidence which he promised the jury during his opening statement that he would produce is indeed a damaging failure sufficient of itself to support a claim of ineffectiveness of counsel." 1 F.3d 159, 166 (3rd Cir. 1993). According to the Third Circuit, the stated inference that jurors would likely draw is that the witnesses mentioned by counsel in the opening statement were later "unwilling or unable to deliver the testimony he promised." *Id.* However, this appellate tribunal concluded that the attorney had not made such a promise. *Id.* at 167.

Likewise, a panel of the First Circuit Court of Appeals (First Circuit) found that an attorney's promise to produce the testimony of a psychiatrist and a psychologist during his opening statement and, the later decision not to put them on the stand was objectively unreasonable and prejudicial as a matter of law. *Anderson v. Butler*, 858 F.2d 16, 17-19 (1st Cir. 1988); *see also Ouber v. Guarino*, 293 F.3d 19, 28 (1st Cir. 2002) ("When a jury is promised that it will hear the defendant's story from the defendant's own lips, and the defendant then reneges, common sense suggests that the course of trial may be profoundly altered.")

In support of his motion, Robinson cites the case of *United States ex rel. Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003). The Seventh Circuit Court of Appeals (Seventh Circuit) in *Hampton* found that where the trial counsel - after having promised the jury that the defendant would testify on his own behalf, and, in so doing, would offer evidence that he was not in a gang - reneged on that promise, his conduct was declared to be unreasonable. 347 F.3d at 257-60. The court, in acknowledging that such changes in trial strategy could be justified if they are caused by unforeseen developments, determined that this was not the situation in *Hampton* where the counsel

knew of the possible pitfalls of putting the defendant on the stand prior to the commencement of trial. *Id.* at 258. In the end, however, the Seventh Circuit held that the broken promise was "not so prejudicial that it would support relief in and of itself" but rather helped to "underscore the more important failure to investigate exculpatory occurrence witnesses." *Id.* at 260.

Robinson has also proffered a more recent case in which the Sixth Circuit concluded that the petitioner had been given ineffective assistance of counsel when the evidence disclosed that the trial attorney (1) had failed to properly investigate a witness and (2) did not call her to the witness stand despite having promised the jury that she would testify. *English v. Romanowski*, 602 F.3d 714, 726-28 (6th Cir. 2010). In *English*, the Court found that the decision of the trial attorney not to call the witness did not constitute a deficient performance, reasoning that there were several legitimate reasons for his decision. *Id.* at 727. However, it held that the lawyer's failure to adequately investigate this decision before trial was unreasonable. *Id.* at 728. The Court therefore decreed that "it was objectively unreasonable for [the petitioner's] trial attorney to decide before trial to call [the] witness, make that promise to the jury, and then later abandon that strategy, all without having fully investigated [the witness] and her story prior to opening statements." *Id.* Moreover, the Court cited the *Anderson* and *Hampton* decisions in determining that the petitioner had been prejudiced by his counsel's deficient performance, in part, based on the unfulfilled promise to the jury. *Id.* at 729. These cases illustrate that, while a failure to present evidence that was promised to the jury by trial counsel during the opening statement may, under certain circumstances, be unreasonable and/or prejudicial, it may not always constitute a constitutional deprivation of the assistance of counsel.

In this case, in his opening statement, Barnett characterized the case against his client as one about credibility. Indeed, the Government did not have any physical evidence to demonstrate that

Robinson was a felon in possession of ammunition (e.g., fingerprints). Barnett then stated that Robinson would testify and tell the jury his version of events, one that would be a direct challenge to that of the two arresting officers. He also testified during the evidentiary hearing that it was a strategic choice to put Robinson on the stand only to say his name. Barnett gave two reasons for having made this decision; namely, (1) he did not want the Government to publish his client's criminal record and (2) inasmuch as Robinson had acknowledged his personal involvement in the criminal offense, he – as the defense counsel – did not want to suborn perjury. Furthermore, Barnett also asserted that Robinson was in complete agreement with his contemplated trial strategy.

However, the Court does not find Barnett's reasoning to be credible because it is belied by the trial record in this criminal action. First, Barnett asserts that he did not want the Government's counsel to bring out evidence of Robinson's prior convictions. However, Robinson's criminal history was well known to Barnett before the commencement of the trial. Barnett attempted to obtain an evidentiary ruling from the Court on the opening day of trial, asserting that evidence of this kind was irrelevant given the parties' stipulation that Robinson was a convicted felon. The Court, although allowing the Government an opportunity to re-argue the issue later, made a preliminary ruling in Robinson's favor. At that stage in the trial, Barnett was in a position where he could have made a definitive decision as to whether Robinson would or would not testify during the trial. Instead, he chose to offer the jurors a recitation of his client's projected testimony - in painstaking detail - and then failed to deliver on that promise.

Barnett's other allegation (i.e., he did not want to give Robinson any opportunity to perjure himself) is also unconvincing. As stated above, Barnett not only promised the jurors that Robinson would testify and tell his side of the story, but he also told the jurors in detail of the facts that

Robinson would assert. Barnett also stated during the evidentiary hearing that he had chosen his words carefully during the opening statement because of his personal knowledge that Robinson had committed the criminal offense, with which he had been charged.[3] When pressed on cross-examination about this statement, he stated that did not "recall saying anything to the jury about whether or not [Robinson] had a gun or not." (Evid. Hrg., 45:22-24 Jan. 28, 2010.) The jury trial transcript reveals the opposite. Barnett stated in no uncertain terms during his opening statement: "There is no gun, period. He [referring to Robinson] doesn't have one." (Trial, June 30, 2004 47:19.) In short, Barnett's opening statement included a wholesale adoption of Robinson's version of the events that took place during the early morning hours of July 4, 2003. If the Court is to accept Barnett's statements at the evidentiary hearing as being truthful, he knew from the outset that Robinson possessed a gun and ammunition at the time of his arrest. Thus, his presentation to the jury of the evidence that his client Robinson would offer in the form of testimony during the trial would be tantamount to an attorney actively aiding in the proffering of perjured testimony to the Court and the jurors – precisely what he now claims he sought to avoid.

Barnett also acknowledged during cross-examination that there were no evidentiary surprises

---

[3] Barnett also testified that he explained the following to Robinson:

I advised him of two things. That, one, every person has an absolute right to testify, no question about it. And that more than anything the decision to testify and to testify is the decision of the defendant, not the lawyer. But I told him that it was my obligation knowing that I know what the truth is, knowing that you had the gun, that in a court of law you can't get up and lie about it. You can't get up and say you didn't have a gun. And you can't say you didn't have the bullets. You can't do that. So I advised him that he could not give false testimony in court.

(Evid. Hrg., 28:15-24 Jan. 28, 2010.)

at any time before or during the trial which would warrant such a change in strategy after he had promised the jurors that they would hear from Robinson.[4]  A reading of the *Hampton* case suggests that there may be some situations wherein an attorney must change strategies during mid-trial in order to accommodate unforeseen circumstances.  *See* 347 F.3d at 258.  There is no evidence of unforeseeable events taking place in this case.  Therefore, the Court concludes that Barnett was unreasonable in choosing to change his strategy during mid-trial and not placing Robinson on the stand to testify and fulfill his earlier promise to the jury.

Turning to the second prong of the *Strickland* test, the Court must determine whether Barnett's unreasonable conduct resulted in a prejudice to Robinson. The Sixth Circuit opined that "(w)hen determining prejudice, [courts] must consider the errors of counsel in total, against the totality of the evidence in the case."  *Stewart v. Wolfenbarger*, 468 F.3d 338, 361 (6th Cir. 2006). As Robinson notes in his brief - and Barnett has acknowledged - his case rests on the credibility of the witnesses.  The officers had an account of the events that is at odds with Robinson's version of the facts. There is no physical evidence which connects Robinson to his possession of the ammunition as charged by the Government.  Notwithstanding, the Court believes that Barnett's broken promise to the jury - without more - is insufficient to establish a reasonable probability that but for Barnett's commentary to the jury, the result of the proceeding would have been different.

---

[4] During the evidentiary hearing, Barnett was questioned about this and answered as follows:

Q. Okay. Well, my question is, nothing changed from the day you were retained by Mr. Robinson to the day you went to trial in terms of evidence coming to your attention.

A.  I believe that's true.

(Evid. Hrg. 54:22-25, Jan. 28, 2010.)

However, when combined with Barnett's failure to investigate possible witnesses who would have corroborated Robinson's version of events and directly attacked the credibility of the officers, there is a reasonable probability that the outcome of the case would have been different.

B.

Robinson also claims that Barnett was unreasonable in failing to properly investigate his case. More specifically, he claims to have told Barnett that (1) there were identifiable witnesses who were willing to testify on his behalf, (2) some of these witnesses had filed citizen complaints about the officers' conduct during the early morning hours of July 4th, and (3) he had medical records which supported his contention that the arresting officers were physically abusive to him during the early morning of his arrest. Robinson maintains that this information would have come to light at trial only if Barnett had conducted a reasonable investigation into his assertions. The Government disagrees, stating that Barnett "disproved this accusation" during the evidentiary hearing.

The Sixth Circuit declared in 2005 that "[i]t is well-established that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005) (quoting *Strickland*, 466 U.S. at 691). "This duty includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Id.* (citations omitted). In any case where the defendant alleges ineffective assistance of counsel, the trial court must assess a defense attorney's decision not to investigate for reasonableness under the circumstances, while "applying a heavy measure of deference to counsel's judgments." *Id.* Further, "[a] purportedly strategic decision is not objectionably reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Id.* (quoting *Horton v. Zant*, 941 F.3d 1449, 1462 (11th Cir.

14

1991)).

The strategic choices of counsel, including a determination that an investigation is not necessary, are accorded great deference. *Workman v. Tate*, 957 F.2d 1339, 1345 (6th Cir. 1992). However, "[w]here counsel fails to investigate and interview promising witnesses, and therefore has no reason to believe they would not be valuable in securing the defendant's release, counsel's inaction constitutes negligence, not trial strategy." *Id.* (citations omitted). Indeed, the Sixth Circuit has found that such a failure constitutes ineffective assistance of counsel. *See, e.g., Workman*, 957 F.2d at 1345 (ineffective assistance of counsel where attorney failed to interview and call the only two witnesses aside from defendant whose account contradicted officers' versions); *Towns*, 395 F.3d at 259-60 (counsel's decision to refrain from calling witness unreasonable because he had not contacted witness who would have exonerated defendant); *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir. 1987) (attorney's failure to locate and question alibi witness was ineffective representation).

In the instant case, Barnett acknowledged in his response to the order to show cause issued by the Court and during the evidentiary hearing that Robinson had provided him with a list of names and accompanying telephone numbers of prospective witness. However, he maintained that "[a]fter discussing these potential witnesses with the [D]efendant, we decided to place one person, Lawrence Patton, on the witness list and thereafter agreed not to call [him] to the stand." (Doc. #59, Resp. to show cause ¶ 6.) Barnett also asserted that "[a]ny claim that we failed to seek out or interview the witnesses is untrue because it was not necessary." (*Id.* at ¶ 7.)

During the evidentiary hearing, Barnett stated that although he and Robinson had discussed the list of witnesses, "[s]ome of them [could be] impeached, people that were in prison, or – I had client records I recall and none of them knew anything about the facts and circumstances of the

particular case." (Evid. Hrg. 27:11-14, Jan. 28, 2010.)

Robinson testified at the evidentiary hearing that he not only provided Barnett with a witness list but that he brought several witnesses to his office. However, he noted that the only person with whom Barnett talked was Lawrence Pattson.[5] Barnett was of the opinion that it was not necessary to seek out and interview these witnesses because, in his judgement, they did not know anything about the case. However, this strategic decision was unreasonable in light of the testimony that would have been offered by at least one witness, Willard Ware.

During his appearance at the evidentiary hearing, Ware testified that when the officers arrived, Robinson was sitting on his front porch while the other persons who had gathered for the barbeque were scattered around in different locations. Ware asserted that he never saw Robinson run away from the officers. Ware also commented that Robinson, after approaching the officers and following an exchange of words with them, was knocked to the ground and struck. Robinson was then arrested and taken to the police station. Ware stated that he followed Robinson to the police station and lodged a complaint regarding the arresting officers' conduct.

Ware's testimony during the evidentiary hearing underscores both (1) the deficiency of Barnett's investigation and (2) the prejudice to Robinson's case. Barnett's assertion that the witnesses did not know anything about the facts and circumstances of the case is belied by Ware's testimony.[6] Even assuming that Ware did not know whether Robinson possessed a gun with

---

[5] This witness' last name is spelled differently throughout the transcript (i.e., Pattson, Patson, Patton). Robinson, when was asked by the Court to spell the name of this witness, testified that it was spelled Pattson. (Evid. Hrg., 17:6 Jan. 6, 2010.)

[6] Barnett's assertion that the witnesses could be impeached because of criminal records is inconsistent with Ware's testimony under oath. During the evidentiary hearing, Ware asserted that he (1) had just been honorably discharged from the United States Navy and (2) has no

ammunition on the night of his arrest, his version of events is at odds with the officers' portrayal of the events. Of particular importance is that Harris claimed to have followed Robinson into the empty field, where Robinson allegedly threw the gun that Harris recovered after subduing Robinson. Thus, Ware's account of the events amounted to a corroboration of Robinson's account (i.e., Robinson never ran away from the officers and was never chased by Harris into the vacant lot). The only support for the Government's claim that Robinson was in possession of the gun was Harris' testimony. Johnson, while agreeing with Harris that Robinson ran into the field, did not see him with a gun. As Barnett acknowledged, this case was based on the credibility of the witnesses and if the jury had been presented with an opposing version of events than that presented by the officers, there is a reasonable probability that they would have accepted Robinson's version of the events. The Court believes that Barnett's failure to investigate the validity of his client's version of the facts, especially when coupled with his unfulfilled promise to the jury, amounts to a reasonable probability that is a sufficient ground to undermine confidence in the outcome of the case.

The Court will grant Robinson's petition for habeas relief on the basis of the two foregoing claims. However, for the purposes of completeness, it will briefly address Robinson's two remaining claims. *See Daniel v. Palmer*, 2010 U.S. Dist. LEXIS 64936 at *25 (E.D. Mich. June 30, 2010) (citing *Brown v. Palmer*, 358 F. Supp. 2d 648, 656 (E.D. Mich. 2005)).

### C.

Robinson has also alleged that he had been denied ineffective assistance of counsel because Barnett did not allow him to testify, thereby infringing upon his constitutional right. The Government argues that the record does not support this assertion because its counsel had been

criminal convictions.

informed by Barnett of his intention to put Robinson on the witness stand and only ask his name. The Government, in making this argument, impliedly suggests that Robinson's failure to express any objection to this proposed trial strategy constitutes a waiver of his right to make this contention against his counsel.

A criminal defendant's right to testify at trial is a fundamental right that may only be knowingly and voluntarily waived by the defendant. *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000). Although the defense attorney has a legal obligation to advise his client about the wisdom, if any, of taking the witness stand, it is the defendant who must make the ultimate decision. *Id.* However, because attorneys are obliged to follow the professional rules of conduct, "when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *Id.* at 551. Therefore,

> [a] defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. At base, a defendant must alert the trial court that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so.

*Id.* (internal citations omitted).

In the instant case, Robinson has failed to proffer any evidence to suggest that, at the time of his trial, he disagreed with Barnett's decision to call him as a witness only to ask his name. As the Government correctly notes, although one of the discussions between Barnett, counsel for the Government and the Court occurred outside of his presence (at side bar), there was another colloquy between the two lawyers and the Court in Robinson's presence regarding this strategy. Robinson at no point gave the Court any indication that he wanted to testify and/or that he disagreed with his

lawyer's strategic decision. Therefore, as the *Webber* opinion instructs, absent anything in the record evidencing the contrary, the Court must assume that Robinson waived his right to testify. *See Hodge v. Haeberlin*, 579 F.3d 627, 639 (6th Cir. 2009) (defendant's "present allegations that he wanted to testify and was prevented from doing so do not suffice to overcome the presumption that he assented to the tactical decision that he not testify.") Accordingly, Robinson has not shown that Barnett's conduct constituted deficient performance with regard to this claim.

D.

Finally, Robinson has argued that Barnett's conduct was unreasonable and caused him to suffer a prejudice by failing to communicate the Government's plea offer to him. During the evidentiary hearing before the Court, Robinson testified that Barnett never told him about the plea offer. Barnett directly contradicted Robinson's assertions, though he could not point to any notes or any other written confirmation that he had in fact shown the plea offer to his client.

The Sixth Circuit has held that a defense attorney acts unreasonably in failing to communicate a plea offer to his client. *Guerrero v. United States*, 383 F.3d 409, 416 (6th Cir. 2004) (citing *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir. 2003)). Thus, a habeas petitioner must show that (1) the Government had made a plea offer and (2) his attorney failed to communicate it to him in order to meet the first prong under *Strickland*'s ineffective assistance of counsel test. *Id.* In order to meet the prejudice prong of *Strickland*, the petitioner must show that there is a reasonable probability that if he had known about the plea offer, he would have accepted it. *Id.*

Here, Robinson and Barnett agreed that the Government had made a plea offer. Indeed, the parties' plea agreement was placed into the record during the evidentiary hearing as Exhibit 1. Robinson and Barnett had diametrically different versions about what happened thereafter.

However, even assuming that Robinson's version of events is correct and Barnett never communicated the plea agreement to him, he has failed to show prejudice by this deficiency. During the evidentiary hearing, the Government had the following colloquy with Robinson:

> Q. You had no intention of pleading guilty, correct?
> A. No.
> Q. So there is no way you were going to take that plea offer, right?
> A. Honestly, I can't say.
> . . .
> Q. The Plea Agreement says, guideline range of 46 to 57 months. Does that sound familiar to you?
> A. I don't know. I never – Mr. Barnett never talked to me or discussed it with me. I never seen it so I don't know what it was.
> Q. Were you going to go to prison for 46 to 57 months or were you going to fight it?
> A. I don't know.
> Q. Well, I am a little confused Mr. Robinson because you testified that you had no intention of pleading guilty. Now you're saying something different, correct?
> A. No. I had no intention of pleading guilty. You are right.
> Q. All right.
> A. And I had no intent – I wanted to fight this case and prove that I was innocent and had an opportunity to do that. That's why I hired Mr. Barnett to do that.

(Evid. Hrg., 51:14-52:16 Jan. 6, 2010.)

Based on Robinson's own assertions during the evidentiary hearing, the Court finds that he has failed to establish that had Barnett shown him the Government's plea offer, there is a reasonable probability that he would have accepted it. Indeed, the Court believes that Robinson would have done just the opposite. Robinson testified that he wanted to prove his innocence at trial, and had he been shown a plea offer, he likely would have rejected it.

## IV.

With respect to the remedy to be granted, § 2255 states that where the court finds that there has been a denial of the petitioner's constitutional rights, "the court *shall* vacate and set the

judgment aside and *shall* discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." 28 U.S.C. § 2255(b) (emphasis added). The Supreme Court has held that § 2255 "can perform the full service of habeas corpus, by effecting the immediate and unconditional discharge of the prisoner." *Andrews v. United States*, 373 U.S. 334, 339 (1963); *see also United States v. Torres-Otero*, 232 F.3d 24, 30 (1st Cir. 2000) ("The § 2255 remedy is broad and flexible, and entrusts to the courts the power to fashion an appropriate remedy."); *United States v. Garcia*, 956 F.2d 41, 45 (4th Cir. 1992) (same).

The Court first notes that Robinson has already served almost his entire prison sentence after having been convicted following a jury trial where he was not afforded his Sixth Amendment right to the effective assistance of counsel. Therefore, the principles of justice and equity lead the Court to conclude that Robinson is entitled to relief under 28 U.S.C. § 2255 and (1) vacates and sets aside his conviction and sentence and (2) immediately and unconditionally discharges him from federal custody.


IT IS SO ORDERED.


Dated: October 1, 2010                         s/Julian Abele Cook, Jr.
          Detroit, Michigan                         JULIAN ABELE COOK, JR.
                                                    United States District Court Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on October 1, 2010.

s/ Kay Doaks
Case Manager